Nina Wasow, California State Bar #242047
Catha Worthman, California State Bar #230399
FEINBERG, JACKSON, WORTHMAN & WASOW LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704-2658
Tel. (510) 269-7998
Email: nina@feinbergjackson.com
Email: catha@feinbergjackson.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORLYN DUNCAN and BRUCE DUNCAN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>     v.<br><br>THE ALIERA COMPANIES, INC., f/k/a ALIERA HEALTHCARE, INC., a Delaware corporation; and TRINITY HEALTHSHARE, INC., a Delaware corporation,<br><br>                  Defendants. | Civil Case No. |

## CLASS ACTION COMPLAINT

### I.   PARTIES

1.     Plaintiffs CORLYN DUNCAN and BRUCE DUNCAN, husband and wife, are citizens of California who reside in Benicia, Solano County.  Mr. and Ms. Duncan were enrolled in a health care plan from Defendants Aliera Healthcare and/or Trinity Healthshare from January 1, 2018 through December 31, 2019.

2.     Defendant THE ALIERA COMPANIES, INC. ("Aliera") is a Delaware corporation headquartered in Atlanta, Georgia.  It is incorporated as a for-profit business, without

any express religious affiliation.  It changed its name in 2019 from ALIERA HEALTHCARE, INC.

3.     Defendant TRINITY HEALTHSHARE, INC. ("Trinity") is a Delaware corporation headquartered in Atlanta, Georgia and purports to be a nonprofit entity.  Trinity was incorporated on or about June 27, 2018.  Aliera and Trinity are collectively referred to as "Defendants."

4.     Aliera markets, sells, and administers insurance plans for Trinity and is solely responsible for the development of plan designs, pricing, marketing materials, vendor management, recruitment and maintenance of a sales force on behalf of Trinity.

5.     Neither Aliera nor Trinity holds a certificate of authority from the California Department of Insurance as required by Cal. Ins. Code § 700, and neither is authorized or licensed to provide any type of insurance plan in California.

## II.  JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and § 1367 because there is diversity of citizenship and the amount in controversy related to the proposed class claims exceeds $75,000.

7.     Venue is proper because some of the acts or omissions occurred in the Eastern District of California, and the named Plaintiffs and many of the proposed class members reside in that District.

## III.  NATURE OF THE CARE

8.     Defendants sold inherently unfair and deceptive health care plans to California residents, and failed to provide them with the coverage the purchasers believed they would receive.  Defendants claimed the health care plans were not "insurance" in order to avoid both oversight by the state insurance commissioner and minimum requirements mandated by the Patient Protection and Affordable Care Act ("ACA"). At the same time, Defendants created the

health care plans to look and feel like health insurance that would provide meaningful coverage for the purchasers' health care needs.

9.      When Congress passed the ACA in 2010, it required all individuals to be covered by health insurance or pay a penalty.  Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A.  One of those exceptions was for members of existing Health Care Sharing Ministries ("HCSMs").  In order to qualify as an HCSM under the ACA, an entity must meet rigid requirements, including: (1) it must be recognized as a 501(c)(3) tax exempt organization; (2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs;" and (3) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(ii).  At no time has for-profit Aliera ever met the definition of an HCSM.

10.     Aliera, in an attempt to exploit this exception, falsely represented that the health care products it designed and sold were from a legitimate HCSM.  It initially sold its own products in connection with an HCSM, Unity Healthshare LLC ("Unity").  It falsely represented to its customers that they were purchasing a Unity HCSM product, even though Aliera alone designed, marketed, and sold the plans, administered all claims, directly received all payments from members, and controlled the membership roster, without any meaningful input from Unity.

11.     When Aliera's relationship with Unity soured, it created defendant Trinity in July 2018, and claimed that Trinity had been "recognized" as an HCSM.  Trinity did not meet the requirements of 26 U.S.C. § 5000A(d)(2)(B)(ii) because it was not in existence continuously since 1999, and because it did not require its members to adhere to its stated ethical or religious beliefs. It was never, and could not have been, "recognized" as an HCSM because the federal agency that had at one time provided letters of recognition stopped doing so in 2016, before Trinity was created. Trinity filled the role that Unity had played with Aliera and its members, and assumed

the responsibilities and duties to existing members who had purchased the Aliera product marketed with the Unity name.

12.     While falsely representing that members were purchasing an HCSM plan through Unity, and then by representing that Trinity is a recognized HCSM, Defendants sought to avoid state insurance protection statues by claiming the products they sell are not "insurance."  In fact, Aliera created, marketed, sold, and administered illegal and unauthorized insurance plans to California residents.  These plans do not comply with the minimum basic requirements for authorized health care plans under state or federal law.

13.     On information and belief, Defendants sold the illegal health insurance plans to thousands of California residents. As a result, California residents (1) paid for an illegal contract, and (2) were denied coverage for medical care required by law to be provided.

14.     Aliera and its owners, however, have realized exorbitant profits.  On information and belief, Aliera takes over 83% of all payments made by individuals, while refusing to pay claims.

15.     Defendants' representations that the insurance plans were HCSM plans and would provide members with meaningful coverage were fraudulent, misleading, unfair and/or deceptive in violation of California's Unfair Competition Law, False Advertising Law, and Unfair Insurance Practices Act.  At no relevant time did the Defendants' plans meet the requirements for HCSMs under federal law as represented, meet the requirements of health insurance plans under federal or California law, or provide the coverage that was represented.

16.     Plaintiffs, on behalf of the class they seek to represent, filed this lawsuit to obtain declaratory and injunctive relief to prevent Defendants from continuing to arbitrarily and in bad faith deny or delay  payment of claims  that should be covered under legitimate health insurance plans. On behalf of the proposed class and on their own behalf, Plaintiffs also seek either rescission of their plans and return of premiums paid, or reformation of the plans to provide

coverage for uncovered health care expenses that should have been paid had the plans sold been authorized and legal rather than sham health insurance plans.

17.     Plaintiffs, on behalf of the class they seek to represent, also seek disgorgement, imposition of a constructive trust, and/or restitution of Defendants' unlawful profits.  Defendants have breached their fiduciary duties to class members and have been unjustly enriched by taking unreasonable fees and commissions, while arbitrarily and unreasonably refusing to pay claims. They have profited from payments class members made believing, based on Defendants' representations, that they would be covered for medical expenses.

## IV.  CLASS ALLEGATIONS

18.     ***Definition of Class:***  Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action on behalf of herself and all persons similarly situated.  The proposed Class is defined as follows:

> All California residents who purchased a plan administered by Aliera
> from any of Defendants or their subsidiaries that purported to be a
> "health care sharing ministry" plan at any time since September 11,
> 2017.

19.     ***Size of the Class:***  The Plaintiffs' proposed class is so numerous that joinder of all members is impracticable.  On information and belief, at least 11,000 individuals in California are or have been covered by Defendants' plans.

20.     ***Common Questions of Fact and Law:***  There are questions of law and fact that are common to all class members including:  (1) whether the healthcare products that the Defendants created, marketed, sold, and administered to class members met the legal requirements of an HCSM under 26 U.S.C. § 5000A; (2) whether plans sold were "insurance" under California insurance law; (3) whether California insurance law and regulations forbid the creation, marketing, sale, and administration of health care products in the "business of insurance" without authorization or other legal exception; (4) whether Defendants failed to obtain proper authorization for the creation, marketing, sale, and administration of an insurance product in California; (5) whether class members are entitled to (a) rescission of the plan(s) and refunds of

all premiums paid and/or (b) reformation of the plans to comply with the minimum insurance coverage requirements of California and federal law, and re-processing of all claims for expenses and costs incurred that would have been covered had the plan(s) properly complied with those laws; (6) whether Defendants' actions were unfair, deceptive, untrue or misleading, and likely to deceive consumers, in violation of California's Unfair Competition Law, False Advertising Law, and/or Unfair Insurance Practices Act; (7) whether Defendants owed a fiduciary duty to their members, and whether they breached that fiduciary duty; (8) whether Defendants have been unjustly enriched by collecting members' payments while failing to pay claims, and by paying themselves unreasonable fees and commissions; (9) whether a constructive trust should be imposed; and (10) whether class members are entitled to other relief resulting from Defendants' unfair and/or deceptive acts.

21. ***Class Representative:*** The claims of the named Plaintiffs are typical of the claims of the proposed class as a whole resulting from Defendants' sale of unauthorized and illegal insurance plans. The named Plaintiffs will fairly represent and adequately protect the interests of the class members because they have been subjected to the same practices as other class members and suffered similar injuries. The named Plaintiffs do not have interests antagonistic to those of other class members as to the issues in this lawsuit.

22. ***Separate Suits Would Create Risk of Varying Conduct Requirements***. The prosecution of separate actions by class members against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct. Certification is therefore proper under Fed. R. Civ. P. 23(b)(1).

23. ***Defendants Have Acted on Grounds Generally Applicable to the Class.*** Defendants have uniformly created, marketed, approved, sold and/or administered unauthorized health insurance plans in California. They have misrepresented the plans as HCSM plans under federal and state law. Defendants have acted on grounds generally applicable to the proposed

class, rendering declaratory and injunctive relief appropriate respecting the whole class. Certification is therefore proper under Fed. R. Civ. P. 23(b)(2).

24. ***Questions of Law and Fact Common to the Class Predominate Over Individual Issues.*** The claims of the individual class members are more efficiently adjudicated on a class-wide basis. Any interest that individual members of the class may have in individually controlling the prosecution of separate actions is outweighed by the efficiency of the class action mechanism. Upon information and belief, no class action suit is presently filed or pending against Defendants for the relief requested in this action. Issues as to Defendants' conduct in applying standard marketing, sales and administration practices towards all members of the class predominate over questions, if any, unique to members of the class. Certification is therefore additionally proper under Fed. R. Civ. P. 23(b)(3).

25. ***Venue***. This action can be most efficiently prosecuted as a class action in this jurisdiction, where Defendants do business and where Plaintiffs reside.

26. ***Class Counsel***. Named Plaintiffs have retained experienced and competent class counsel.

## V.  FACTUAL BACKGROUND

### A.  Aliera Seeks Out an HCSM to Avoid Insurance Requirements, and Sells Sham HCSM Products through Unity

27. Defendant Aliera was incorporated in the State of Delaware by Timothy Moses, a convicted felon, his wife Shelley Steele, and their son Chase Moses, in December 2015. Before forming Aliera, Timothy Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud and perjury. As a result of the case, titled *United States v. Moses*, 1:04-cr-00508-CAP-JMF (N.D. Ga.), Moses was sentenced to over 6 years in prison, and ordered to pay $1.65 million in restitution.

28.    Aliera is a for-profit entity.  Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses, to buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders …"  The formation documents of Aliera Healthcare, Inc. do not include any discussion of religious or ethical purposes or missions.

29.    Aliera began selling its healthcare products in late 2015.  At the time it was formed, it only sold "direct primary care medical home (DPCMH)" plans.  DCPMH plans generally cover limited services such as some doctors' visits and basic lab services.  These plans provide no hospitalization or emergency room coverage and are not ACA-complaint.

30.    Aliera realized that it could greatly increase the sales of its healthcare products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSMs from the ACA's individual mandate.

31.    Non-party Anabaptist Healthshare ("Anabaptist") was a small Mennonite entity located in Virginia with about 200 members. Anabaptist had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services ("CMS") as an HCSM.  CMS had provided a letter to Anabaptist that it met the requirements under 26 U.S.C. § 5000A to operate an HCSM.  Specifically, CMS found that Anabaptist had been "in existence at all times since December 31, 1999 and medical expenses of its members have been shared continuously and without interruption since December 31, 1999."

32.    In 2016, Timothy Moses convinced Anabaptist to permit Aliera to market its own DCPMH plan "side by side" with Anabaptist's sharing program using Anabaptist's HCSM designation. Anabaptist created a wholly-owned subsidiary, called Unity Healthshare ("Unity"), for that purpose.  Under the proposal, Aliera would market both its own plan and the Unity HCSM together as a healthcare product it claimed would be exempt from the ACA's mandates.

33.     Aliera entered into a contract with Unity on or about February 1, 2017.  Under that contract, Aliera would offer its own health products to the public that did not meet coverage requirements under the ACA and did not independently qualify for the HCSM exemption under 26 U.S.C. § 5000A.  In return, Aliera's customers would join the Unity HCSM, increasing members to Anabaptist's HCSM.

34.     Although Aliera marketed the plans to consumers throughout the country as HCSM plans through Unity, in reality, Unity was merely a shell with an HCSM designation, through which Aliera, a for-profit entity that was never an HCSM, could push its own DCPMH plans, while also  designing, marketing, selling, administering, and controlling the Unity HCSM plans.  For example:

(a)     All member payments were paid directly to Aliera.

(b)     The purported "sharing" component of the HCSM was delegated to Aliera.

(c)     Aliera handled all member claims for health care coverage.

(d)     Aliera served as the program administrator for the Unity HCSM plans.

(e)     Members interfaced only with Aliera, not Unity.

(f)     Aliera personnel made the final decision whether a claim would be paid.

(g)     Aliera controlled the Unity member list.

(h)     Aliera developed all plans and programs for the HCSM component of the Aliera products.

(i)     Aliera controlled the Unity website.

35.     In selling the Unity-branded products, Aliera did not require members to attest to any common religious belief.  It required only an agreement to adhere to generic spiritual and ethical beliefs that "personal rights and liberties originate from God," "every individual has a fundamental right to worship God in his or her own way," there is a moral obligation "to assist our fellow man when they are in need," there is a duty to "maintain a healthy lifestyle," and a fundamental right of conscience to direct one's own healthcare exists. *See Appendix E,* at 13-14.

36.     On September 11, 2017, Aliera registered to do business in the state of California. On information and belief, Aliera began selling its health plans to California residents on or around that date, claiming they were plans exempt from the ACA because of the Unity affiliation.

37.     The healthcare plans marketed under Unity's name that Aliera designed, marketed, administered and controlled, and sold to California residents were sham HCSM products that did not exempt them from California insurance regulation or the ACA.

**B.     After Aliera's Relationship with Unity Soured, It Created Trinity, a Sham HCSM, Converted the Unity Products to Trinity Products, and Continued to Sell to California Consumers through Trinity**

38.     In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Mr. Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval, and had not properly maintained assets for payment of benefits to members.  Unity terminated the relationship with Aliera in summer 2018. A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in Superior Court of Fulton County Georgia in late 2018.  *See Aliera Healthcare v. Anabaptist Health Share et al.,* No. 2018-cv-308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.).  The court found that administrative fees paid to Aliera under its agreement with Unity amounted to millions of dollars.  *See Appendix A,* Order Entering Interlocutory Injunction and Appointing Receiver dated April 25, 2019, at 8, ¶¶ 45-46.

39.     With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM.  Therefore, Aliera and its principals created Defendant Trinity on June 27, 2018 as a purported nonprofit entity.  William Rip Theede, III became the CEO of Trinity.  Mr. Theede is a former Aliera employee.  He is also a close family friend of the Moses family and officiated at Chase Moses' wedding.

40.     Trinity could not qualify as an HCSM because it was created after December 31, 1999, and had no members when it was created.  In order to qualify as an HCSM under federal law, the entity or a predecessor of the entity must, among other requirements, have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have

been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV).    Trinity has not had members who have shared medical expenses "continuously and without interruptions since at least December 31, 1999," and it had no predecessor entity.

41.    In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs…." 26 U.S.C. § 5000A(d)(2)(B)(III).    Although Trinity's bylaws set forth a specific set of religious beliefs, it has never restricted its membership to those individuals who affirm the specific common religious beliefs. Instead, it has continued to use the identical set of generic spiritual and ethical "beliefs" that Aliera had devised for the Unity plans. *Appendix D,* at 18.

42.    While prospective agents must take a training assessment before selling the Trinity plans, the questions asked in the assessment do not address any religious or ethical motivation. Defendants' advertisements for prospective agents, and the training materials for agents do not mention a religious or ethical component for purchasers of these plans.  In a training video posted on YouTube on November 1, 2018, an Aliera trainer explains that the "statement of faith"

> basically is saying that you believe in a higher power. It doesn't necessarily have to be a Christian God, or a Buddhist God, or a Jewish God. It doesn't … matter as long as we all believe that there is a higher power and we're all living our life that the best way that we possibly can. We're maintaining a healthy lifestyle. We're trying to avoid those types of foods, behaviors, habits – things that, you know, cause us illness that are in our control.
>
> As long as we're doing those types of things, we're all like-minded individuals. So if you feel that way, and you are a like-minded individual, that's all we're trying to find out. And, if you are, you're gonna say, "Yes," you believe in the five same statement of beliefs that we all do.

43.    Agents in California have represented Trinity as being the most flexible  in terms of belief statement and as having the "most relaxed statement of beliefs and qualifications" of

purported HCSMs. *Appendix B,* at 24. It represents that it "welcomes members of all faiths." *Appendix C,* at 11.

44.     Defendants represent that Trinity is "recognized" as a qualified HCSM. *See Appendix C*, at 3.  It was, in fact, impossible for Trinity to be "recognized" as such because the rule that provided such recognition was eliminated years before Trinity was even created.  In 2013, the United States Department of Health and Human Services ("HHS") promulgated a rule under which it certified HCSMs by issuing a certificate of exemption to the entity.  However, the rule was eliminated in 2016. *See* 81 Fed. Reg. 12281 (final rule eliminates the issuance of exemptions for HCSMs).  Trinity has never appeared on any list of recognized HCSMs developed by HHS.

45.     Likewise, the Internal Revenue Service ("IRS") does not and has never recognized any entities as HCSMs.  Its role is limited to accepting tax returns from individuals who may claim that they are entitled to an HCSM exemption on their individual tax returns.  Individual members, in turn, rely on the plan provider to notify them whether the plan is from a legitimate HCSM.  The IRS has never recognized Defendants as a qualified HCSM under 26 U.S.C. § 5000A(d)(2)(B).  Defendants' representations to the contrary are false and misleading.

46.     On or about August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale and administration of purported HCSM plans. The contract allowed Aliera to use Trinity's non-profit status to sell health care plans purporting to be HCSM plans, while keeping complete control over the money, the administration of the plans and benefits paid, and the membership roster.  The agreement provides that all member "contribution" payments are made directly to Aliera, which then allocates 30-40% (depending on the plan) of every payment as commissions, and that Aliera will be paid substantial additional administrative fees.  The agreement provides that, for the AlieraCare plan class Plaintiffs purchased here, only about 15.5% of the members' contributions are actually placed into a Trinity "Sharebox" account for payment of claims.

47.     Many of the plans Aliera had sold through the Unity brand, including those sold to the Plaintiffs, were then transferred to the Trinity brand, and pending claims were transferred to Trinity who assumed responsibility for "sharing" them

## C.     The Products Aliera Creates, Markets, Sells, and Administers Are Health Insurance

48.     Plaintiffs and members of the class have been, are, or will be enrolled in healthcare insurance products created, marketed, sold, and administered by Defendant and Aliera through Unity and, after Defendant Trinity was created, through Trinity, that Defendants claimed were HCSM plans.

49.     The terminology Defendants use in connection with their plans is directly analogous to terminology health insurers use, and the plans are designed to look and feel like a health insurance policy.  For example:

(a)     The healthcare plans marketed, sold, and administered charge "members" a "monthly contribution" to participate.  Defendants described the "contributions" members pay as "premiums."  *See, e.g., Appendix C*, at 3-4.  The amount of the premium or "contribution" charged is based on the plan selected by the insured.  *Id.,* at 1.

(b)     The plans require a member to pay a deductible, which Defendants call a "Member Shared Responsibility Amount," or "MSRA."  *Id.,* at 4.  The higher a member's MSRA, the lower the member's "contribution."

(c)     Once the MSRA has been paid, medical bills are paid in accordance with a benefits booklet or "Member Guide" for the selected program.  These benefit booklets contain the "membership instructions" which detail the "eligible medical expenses," "limits of sharing," and exclusions. *See Appendix D.*

(d)     The plans require pre-authorization for certain non-emergency surgeries, procedures or tests, as well as for certain types of cancer treatments. *See, e.g., Appendix D,* at 30.

(e)     Defendants offer different health plans, with different levels of coverage, including "Basic," "Catastrophic," "Standard," and "Comprehensive."  *See Appendix C,* at 3-4. The amount members are expected to pay depends on the plan chosen.

(f)     The standard and comprehensive plans are offered at different benefit levels.  "Standard" is offered at "Value," "Plus" and "Premium" levels. "Comprehensive" is offered at "Bronze," "Silver," and "Gold" levels.  The plans at the higher levels charge more and therefore claim to provide more robust benefits for covered medical conditions.  *Id.,* at 27.

(g)     The plans may require members to pay a "co-expense," analogous to a "copay." *Id.,* at 4.

(h)     The plans provide for "maximum out of pocket" expenses.  *Id.*

50.     The plans provide coverage for medical expenses.  Among other things, the plans claim to provide coverage for preventive care, primary care, urgent care, labs and diagnostics, x-rays, prescription benefits, specialty care, surgery, and emergency room services.  *Appendix D,* at 33-35.

51.     The plans have established preferred provider networks ("PPOs").

52.     The plans contain exclusions and lifetime limits, including a lower lifetime limit for cancer treatment.

53.     Payments are made directly to health care providers on behalf of members who are current on their monthly premiums in the event they experience a covered loss, have met their deductible or MSRA, and otherwise meet the coverage requirements set forth in the Member Guides.  These payments are expressly contingent upon the occurrence of a covered medical need by the participating member.

54.     Like insureds in traditional health plans, members receive an "Explanation of Benefits (EOB)" when a claim is submitted.  The EOBs are substantially similar in look and form to EOBs received from traditional health plans.  *See Appendix L.*

55.     Although Defendants claim Trinity administers "voluntary sharing of healthcare needs for qualifying members," *Appendix D,* at 14, there is nothing voluntary about the insurance plans Defendants market, sell, and administer.  Payment from the program upon the occurrence of a covered loss is determined exclusively by Defendants, purportedly according to the terms in the Member Guide.  Members do not decide who gets paid benefits. Instead, according to the Member Guide, the members must accept Trinity's adjudication of benefits: "The contributors instruct [Trinity] to share clearinghouse funds in accordance with the membership instructions …" "By participation in the membership, the member accepts these conditions." *Id.*, at 21.  The members, however, have no input into the "membership instructions." According to the Member Guide, Trinity, and not the members, is the "final authority for the interpretation" of the membership instructions, and Trinity directs payment to providers on behalf of members who have submitted medical claims that are covered under the benefits booklet.  *Id.*  The Member Guide Aliera created for Unity contains largely identical language. See *Appendix E, at 15.*

56.     Members' "contributions" (i.e. premiums) are not refundable. Although the member "contributions" are called "voluntary," if members fail to make the premium payment, they are not entitled to coverage for medical expenses.  *Appendix D*, at 16.

57.     Defendants represent that the health programs "provide members with options that look and feel like more traditional health care plans but at a fraction of the price."  *Appendix C,* at 26.  They explain that the reason the plans are cheaper is that they are "based on cost sharing … The trade-off is the member shared responsibility (MSRA) [i.e., the deductible] is high."  *Id.*

58.     The plans Defendants sell or have sold are contracts whereby Defendants Aliera and Trinity undertook to indemnify its members against loss, damage, or liability arising from a contingent or unknown event, and are insurance under Cal. Ins. Code § 22.  Defendants are required to comply with California and federal law governing health insurers and producers.

**D.    The Health Insurance Plans Defendants Create, Market, Sell, and Administer Are Illegal**

59.    Defendants Aliera and Trinity do not have a certificate of authority as required by Cal. Insurance Code § 700 to issue insurance within this state and are not authorized insurers under California law.  Defendants have issued illegal and unauthorized insurance products to Plaintiff and other members of the class.

60.    Defendants' plans are not ACA-compliant because they do not meet the minimum coverage requirements or Essential Health Benefits required under the ACA and Cal. Insurance Code § 10112.27.  For example:

(a)    The plans impose a 24-month waiting period on coverage, or significantly limit benefits for, preexisting conditions, which is illegal under the ACA.  *See* 42 U.S.C. § 300gg-3.

(b)    The plans exclude coverage for abortion and/or contraception.

(c)    The plans do not comply with the Mental Health Parity Act,

(d)    The plans impose lifetime caps.

61.    Defendants' plans purport to require binding arbitration, even though Defendants fail to disclose the arbitration as a separate article prominently displayed in the enrollment form, as required by Cal. Insurance Code § 10123.19(a).

62.    The Member Guide, which has never been reviewed or approved, contains inconsistent and contradictory coverage terms and conditions.  For example:

(a)    The Member Guide provides the amounts and types of benefits that are covered, but then suggest Defendants are not required to pay any benefits whatsoever, and provides members with no basis to enforce Defendants' promises, even after the members have paid all required "contributions."

(b)    The Member Guide states the plan is an "opportunity for members to care for one another in a time of need, [and] to present their medical needs to other members," but in

fact Defendants—like an insurance carrier—make all coverage decisions without ever presenting one member's needs to other members.

(c)    Defendants assert that over 1,000,000 providers are in their Preferred Provider Network, and provide lists of in-network preferred providers whose claims they will pay, but then assert providers are not on the list provided.

63.    Aliera and Trinity have never maintained the 80% medical loss ratio of medical expenses paid to premiums received required by the ACA. 42 U.S.C. § 300gg-18.

**E.    California and Multiple Other States Have Found that Aliera and Trinity Are Illegally Marketing, Selling and Administering Insurance Products That Do Not Qualify as HCSMs**

64.    On March 8, 2020, the Insurance Commissioner of the State of California issued a Cease and Desist Order against Aliera and Trinity, ordering that they cease transacting insurance business or receiving any payment in connection with any insurance transaction in the state. *Appendix F.* The Order was based on the Commissioner's findings that Aliera and Trinity are acting as insurers in California without a certificate of authority and "make, issue and circulate misleading advertisements and other materials to California consumers," in violation of Insurance Code § 790.03(a) and (b). *Id.,* at 5, ¶ 24. The Commissioner also found that they did not meet the definition of an HCSM. *Id.,* ¶ 27.

65.    Multiple other states have taken similar action against Aliera and Trinity. *Appendix G.* Those states include:

(a)    ***Texas.*** The Texas Attorney General filed suit against Aliera, claiming it engaged in the business of insurance without a license, and the court entered a TRO on July 12, 2019, prohibiting it from accepting new customers in Texas. Aliera later agreed to accept no new customers during the pendency of the lawsuit.

(b)    ***Washington.*** The Insurance Commissioner entered cease and desist orders against Aliera and Trinity on May 3, 2019, finding Aliera acted as an unlicensed healthcare service contractor and Trinity was not an HCSM. Trinity entered into a consent order on

December 30, 2019, agreeing not to enroll any new Washington residents, and to pay a $150,000 fine.

(c)     *Colorado*. Colorado Division of Insurance found Defendants sold insurance products and issued cease and desist orders on August 12, 2019.  Final Agency Orders dated January 17, 2020, prohibit Aliera from selling the plans in Colorado, and prohibit Trinity from doing business in Colorado.

(d)     *New Hampshire.*  The Insurance Commissioner entered a Cease and Desist Order on October 30, 2019 against Aliera and Trinity, prohibiting the sale or renewal of illegal health insurance in New Hampshire.

(e)     *Connecticut.* The Insurance Commissioner issued a Cease and Desist Order on December 2, 2019, against Aliera and Trinity, finding they were acting as insurers in Connecticut without a certificate of authority

(f)     *Maryland.* On February 27, 2020, the Insurance Commissioner entered an Order revoking Aliera's insurance producer license because it violated a 2018 consent order not to solicit membership in unauthorized insurance plans.

**F.     Plaintiff Was Sold Sham Products by Aliera/Trinity That Did Not Provide the Benefits Promised**

66.     Plaintiffs Corlyn and Bruce Duncan enrolled in an AlieraCare Comprehensive Gold plan on or about November 28, 2017, while Aliera was selling Unity-branded plans.  The plan was represented to them by their insurance agent to be like a Blue Cross insurance plan, but cheaper.  Their membership effective date was January 1, 2018, and they received what they believed was an insurance card showing they had hospital, in-patient, out-patient, emergency room, specialty visit,  preventive, and X-ray and imaging, with certain co-pays and a $1,000 MSRA.  *Appendix H.*

67.     They received a Member Guide from Aliera/Unity after they filled out the enrollment form and made their initial payment.  *Appendix E.*

68. Their membership enrollment form did not disclose that they would be obligated to arbitrate disputes.

69. In 2019, the Duncans were advised that their plan through Aliera/Unity was being transferred to Aliera/Trinity, with the same benefits and the same monthly contribution amount as the Aliera/Unity plan. *Appendix I.* They filled out a new enrollment form. That enrollment form did not disclose that they would be obligated to arbitrate any disputes. *Appendix J.*

70. The Duncans received a new Member Guide that purported to be from Aliera and Trinity. *Appendix D.* Trinity assumed responsibility for claims made under the Unity brand.

71. After they filled out the new enrollment form, they received new insurance cards for AlieraCare TrinityGold, reflecting an effective date of January 2018. The card falsely states that they were members of an HCSM "***recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)***" even though neither Trinity nor Aliera was ever certified or "recognized" by any government agency as an HCSM. *Appendix K.*

72. The Duncans paid $1,287.56 per month for their AlieraCare Comprehensive Gold plan while Aliera partnered with Unity, and $1,612.91 per month for their AlieraCare Comprehensive Gold plan while it partnered with Trinity. They also paid $125 in application fees.

73. The AlieraCare Comprehensive Gold plan sold to the Duncans was insurance under California law. However, the plan failed to comply with California and federal law in its provisions of benefits.

74. On March 16, 2018, Ms. Duncan required surgery. Before the surgery, she contacted Aliera for approval, and Aliera approved both the surgery and the facility where the surgery was performed.

75. Nevertheless, Aliera/Trinity has paid only a fraction of the cost of the surgery, leaving her with a hospital bill of over $70,000. *Appendix L.*

76. The Duncans made repeated attempts to appeal Aliera/Trinity's decision, but each time they called, they were either left on hold, and/or given inconsistent answers about whether,

how much, and which charges would be covered.  After authorizing the surgery, and despite written verification from the surgeon to the contrary, Aliera then insisted the surgery was for a "pre-existing condition" and refused to pay it.  *See Appendix L, M.* The Duncans have submitted additional information in support of their appeal, but Aliera/Trinity has failed to pay.

77.    The Duncans continue to be pursued for this hospital debt, which has adversely affected their credit.

## VI.  CLAIMS FOR RELIEF

### A.    First Claim: Illegal Contract

78.    Plaintiffs reallege all prior allegations as though fully stated herein.

79.    Defendants sold Plaintiff and all members of the proposed class unauthorized and illegal health insurance plans in violation of California law:

(a)    The plans were insurance, *see* ¶¶ 49-58 above, but were sold without authorization in California.

(b)    The plans failed to provide the Essential Health Benefits and imposed waiting periods, excluded coverage for pre-existing conditions, and imposed caps in violation of the ACA and California law. *See* ¶ 60, above.

(c)    The Member Guide contains inconsistent and contradictory coverage terms and conditions that allow Defendants to arbitrarily deny coverage.

(d)    The plans included a binding arbitration provision that was not disclosed and is illegal under California Ins. Code § 10123.19(a).

(e)    Defendants fail to maintain the medical loss ratio required under the ACA.

80.    Plaintiff and all members of the proposed class are entitled to either (a) rescission of the illegal contract(s) and return of the insurance premiums paid; or (b) reformation of the illegal contract(s) to comply with the mandatory minimum benefits and coverage required under California and federal law.

**B.     Second Claim: Violation of California's Unfair Competition Law**

81.     Plaintiffs reallege all prior allegations as though fully stated herein.

82.     Defendants' creation, marketing, sale and administration of unauthorized health insurance plan(s) to class members are illegal under California's Unfair Insurance Practices Act, Ins. Code § 790 *et seq.,* and constitute unfair, unlawful, and/or fraudulent acts under California's Unfair Competition Law (UCL), Cal. Bus. and Prof. Code § 17200 *et seq.*

83.     Defendants have committed unfair acts or practices that are deceptive or misleading or have the capacity to be deceptive or misleading. These acts or practices include, but are not limited to, the following:

(a)     Defendants have consistently represented that their healthcare products are "not insurance."  This representation appears in the Member Guides, in advertising material, in training material and on its webpages.  This representation, however, is false. Under California law, Defendants are offering unregulated insurance to members of the public. *See* ¶¶ 49-58, above. The California Insurance Commissioner has so found.  *Appendix F.*

(b)     While claiming their products are "not insurance," Defendants' deceptively advertise and market their products as a viable substitute for insurance.  Specifically, the advertisements and solicitations deceive or mislead, or have the capacity to deceive or mislead, members of the class that they were purchasing a legitimate health insurance product.  The look and feel of the advertising material suggest that the plans are the same as health insurance products, and their agents represent the products to be comparable to health insurance. They claim their products are "not insurance," however, so that they can avoid state consumer protection and solvency regulation. By claiming their products are "not insurance," they also avoid providing the minimal Essential Health Benefits required under the ACA. *See* ¶¶ 60-63, above.

(c)     Defendants have advertised and represented that Trinity is a "Health Care Sharing Ministry recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)."  This is false.  *See* ¶¶ 40-45, above. They have falsely represented, either directly or through sales agents in California, that Trinity is an "administrator for one of the HCSMs that has been around since before 1999," and

that "Trinity has been helping people cover health care costs for years." *Appendix B.* These misrepresentations deceived consumers into believing that their healthcare plans were faith-based and would be administered in an ethical manner for the benefit of members, rather than for the benefit of for-profit Aliera.

(d)    While representing that Trinity serves as a "neutral clearinghouse" for the payment of claims, Defendants fail to disclose that only a fraction of the funds they receive as member contributions are paid out in claims, that the ACA requires that an insurer pay 80% of the premiums collected as benefits, or that for-profit Aliera takes most of the member contributions as fees, while arbitrarily deciding whether benefits should be paid. Consumers were led to believe that their premiums would primarily be used to pay claims of its members. In fact, most of the contributions were used to pay Aliera and its owners.

(e)    Defendants misrepresent that members' monthly contributions are put into a cost-sharing account with Trinity, which "acts as an independent and neutral clearing house, dispersing [sic] monthly contributions as described in the membership instructions and guidelines." *Appendix D,* at 14. Defendants misrepresent that Trinity, because it is a nonprofit with "nothing to gain or lose financially by determining if a need is eligible or not" is the entity to whom members delegated coverage decision authority. *Id.,* at 21. In fact, contributions are not placed into a cost-sharing account with Trinity, but are paid directly to for-profit Aliera which maintains complete control over payments for medical expenses and maintains exclusive access to and control over the Trinity membership list.

(f)    Defendants misrepresent that the reason the plans are cheaper than ACA-compliant plans is merely that they have higher deductibles, or "MSRAs." *Appendix C,* at 26. In fact, the reason the plans are cheaper is that Defendant Aliera asserts the unilateral discretion to, and does, arbitrarily deny claims.

(g)    Defendants claim they have a "growing nationwide PPO network of more than 1,000,000 healthcare professionals and more than 6,000 facilities," *Appendix D,* at 13, and

provide lists of those professionals and facilities, but then deny claims on the basis that those professionals and facilities are not in-network, or that the providers are charging too much.

(h)    Defendants systematically engage in unfair claims handling practices by arbitrarily denying claims. Even though Defendants represent that the coverage provisions are not legally binding upon them and that they are not legally obligated to pay claims, they then insist members are legally obligated to follow the multilevel Dispute Resolution Procedure outlined in the Member Guides. *Appendix D,* at 31-32.  This burdensome Procedure is not disclosed to consumers in the marketing materials before they commit to enrolling in the plans, and ultimately requires binding arbitration, in violation of California law.   Defendants deceptively use the multilevel Procedure to subject members to Kafkaesque delays and false and inconsistent promises, to delay payment of legitimate claims, and to shield Defendants from legal action.

84.    Members of the public are likely to be, and have been, deceived by these unfair and unlawful practices.

85.    Aliera, who created, marketed, sold, and administered virtually identical plans under both the Unity and Trinity brands, committed the above unfair and deceptive acts while acting for both entities.

86.    Plaintiffs and the class have been injured as a direct result of Defendants' conduct. They were sold unregulated insurance products that are illegal under California law.  The products provide less coverage than permitted under law, thereby rendering the policies less valuable than products that do comply with the law.  Plaintiff and the class have been denied care, or limited in care, due to illegal caps, exclusions and limitations.  Plaintiff and the class have foregone coverage under the ACA, including subsidized benefit packages that would provide legal, comprehensive, and secure health insurance coverage.  Defendants' polices were overpriced for the coverage they purported to provide given that over 80% of the contributions were paid in fees and commissions, rather than to benefits, causing Plaintiff and the class to overpay for the illegal and unregulated policies. They purchased the products with the reasonable belief that their medical bills would be

paid, but Defendants have devised excuses not to pay those claims, or to unreasonably delay in payment of the claims.

**C.      Third Claim: Violation of California's False Advertising Law**

87.      Plaintiffs reallege all prior allegations as though fully stated herein.

88.      Defendants have made untrue and/or misleading statements to residents of California with an intent to induce them to forego legitimate health insurance coverage and to purchase Defendants' sham insurance coverage instead, in violation of California's False Advertising Law (FAL), Bus. & Prof. Code § 17500, *et seq.*

89.      These untrue and/or misleading statements include:

(a)      Advertising and representing Trinity as a "Health Care Sharing Ministry recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)."

(b)      Consistently and repeatedly misrepresenting that AlieraCare/Trinity and AlieraCare/Unity and their related products are "not insurance."

(c)      Misrepresenting that the health care plans they sold were like insurance but cheaper, or were a form of legitimate health insurance.

(d)      Misrepresenting the plans as a "sharing" program that provides members with a role in determining whether claims should be paid, when in fact all coverage decisions were made arbitrarily by Aliera, and in Aliera's best interest.

(e)      Misrepresenting that Trinity, because it is a nonprofit with "nothing to gain or lose financially by determining if a need is eligible or not" is the entity to whom members delegated coverage decision authority.

(f)      Misrepresenting that it provided coverage for medical expenses.

(g)      Misrepresenting that there are over 1,000,000 providers and 6,000 facilities within its PPO, and then denying claims from those providers and facilities listed as within the PPO.

90.    Members of the public are likely to, and have been, deceived by these unfair and unlawful practices.

91.    Plaintiffs and the class have been injured as a direct result of Defendants' conduct by purchasing sham insurance products that did not provide either the benefits offered or that should have offered under a legitimate healthcare plan.

**D.    Fourth Claim: Breach of Fiduciary Duty**

92.    Plaintiffs reallege all prior allegations as though fully stated herein.

93.    Defendants represent that members "voluntarily submit monthly contributions into a cost-sharing account," and that Trinity "act[s] as a neutral clearing house between members." *Appendix D,* at 3.  While disclaiming that there is any legally binding agreement to reimburse members for medical needs, Defendants claim they will serve as the "neutral" intermediary to allow members to share "voluntary" contributions with one another in accordance with "the membership instructions." *Appendix D,* at 14.

94.    Defendants further represent their trustworthiness by claiming Trinity is a "faith based" or religious organization.

95.    Defendants represent that "since Trinity HealthShare has nothing to gain or lose financially by determining if a need is eligible or not, the contributor designates Trinity HealthShare as the final authority for the interpretation of these guidelines." *Appendix D,* at 21.

96.    Defendants have complete control over the financial "contributions" members pay, and complete control over the coverage decisions.

97.    As a result of these representations and their control over members' "contributions," Defendants owe a fiduciary duty to the members.

98.    Defendant Aliera has admitted in court filings and testimony in connection with the Georgia Case that it has a fiduciary duty to the members.

99.    Defendants have breached their fiduciary duty. Trinity has delegated all coverage decisions to for-profit Aliera.  Coverage decisions are made solely by the for-profit Aliera, and in

order to secure its profits, not to provide coverage for members' medical needs.   Plaintiffs and the class members have been arbitrarily denied claims for medical expenses in order to enrich Defendants.

100.    On information and belief, approximately 84% of the member contributions are paid to Aliera in fees and administrative expenses, and not to cover the medical needs of the members.

101.    Plaintiffs and the member class have been injured by Defendants' breaches of fiduciary duty.  The funds that should have been used to pay their claims have instead been used to enrich Defendants.  The excess payments should be disgorged, and held in constructive trust for the benefit of the Plaintiffs and the class to pay their claims or reimburse their premiums.

**E.    Fifth Claim: Unjust Enrichment**

102.    Plaintiffs reallege all prior allegations as though fully stated herein.

103.    Plaintiffs and the class paid substantial monthly contributions.  On information and belief, approximately 84% of the monthly contributions were siphoned off as fees and expenses, largely to benefit Aliera.

104.    Plaintiffs and the class made their payments with the understanding that the funds would be shared among the members to pay medical claims.  They were never advised that a majority of their payments would actually go to Aliera's fees, administrative expenses, and commissions.

105.    Defendants have retained the members' contributions while arbitrarily denying medical claims, and have been unjustly enriched at the expense of Plaintiffs and the class.

106.    Plaintiffs and the class are entitled to restitution of the amount Defendants unjustly retained.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a)    Certify that this action may proceed as a class action as defined in ¶ 18 above;

(b)    Designate Corlyn and Bruce Duncan as class representatives, and designate Eleanor Hamburger and Richard E. Spoonemore, Sirianni Youtz Spoonemore Hamburger PLLC, Michael David Myers, Myers & Company, PLLC, and Nina Wasow and Catha Worthman, Feinberg, Jackson, Worthman & Wasow, as class counsel;

(c)    Declare that Defendants' unauthorized health insurance plans were and are illegal contracts;

(d)    Declare that Defendants' actions as alleged herein towards the members of the class violate California's Unfair Competition Law, False Advertising Law, and Unfair Insurance Practices Act;

(e)    Enjoin Defendants from denying and delaying payment of legitimate health care claims;

(f)    Order (i) rescission of the unauthorized health insurance plans and restitution of all premiums received from members of the proposed class, including interest; or, at the option of any class member (ii) reform the unauthorized health insurance plans to comply with the minimum mandatory benefits required under the relevant state insurance code and federal law, and permit class members to resubmit claims for medical services, costs and other expenses that would have been covered;

(g)    Enter judgment in favor of Plaintiffs and the class on their breach of fiduciary duty claim, and impose a constructive trust for the benefit of the class on all amounts wrongfully retained;

(h)    Order disgorgement and restitution of all contributions Aliera unjustly retained;

(i)    Order payment of reasonable attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5; and

(j)    Grant such other relief as this Court may deem just, equitable and proper.

DATED:  April 28, 2020.

_s/ Nina Wasow_
Nina Wasow, California Bar #242047

_s/ Catha Worthman_
Catha Worthman, California Bar #230399
FEINBERG, JACKSON, WORTHMAN & WASOW LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704-2658
Tel. (510) 269-7998
Email: nina@feinbergjackson.com
Email: catha@feinbergjackson.com

Michael David Myers, _Pro Hac Vice Forthcoming_
MYERS & COMPANY PLLC
1530 Eastlake Avenue East
Seattle, WA 98102
Tel. (206) 398-1188
Email: mmyers@myers-company.com

Richard E. Spoonemore, _Pro Hac Vice Forthcoming_
Eleanor Hamburger, _Pro Hac Vice Forthcoming_
SIRIANNI YOUTZ SPOONEMORE HAMBURGER PLLC
3101 Western Avenue, Suite 350
Seattle, WA 98121
Tel. (206) 223-0303
Email: rspoonemore@sylaw.com
Email: ehamburger@sylaw.com

_Attorneys for Plaintiffs_